***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. On May 16, 2000, the day of injury by accident or occupational disease giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On May 16, 2000, an employee/employer relationship existed between plaintiff and defendant-employer.
3. Reliance Insurance Company was the carrier on the risk. At some point after May 16, 2000, Reliance Insurance Company entered into liquidation. As a result of the liquidation of Reliance Insurance Company, the North Carolina Insurance Guaranty Association came on the risk by assuming the claims previously handled by Reliance Insurance Company. Cambridge Integrated Services Group, Inc., is now the servicing agent for the North Carolina Insurance Guaranty Association in this matter.
4. Defendants admit that plaintiff experienced an injury or occupational disease on or about May 16, 2000.
5. Plaintiff's and defendants agree that plaintiff's average weekly wage was $540.00, with a compensation rate of $360.00.
6. The parties agree that the following Industrial Commission forms may be received into evidence:
a. Form 19, dated July 5, 2000;
b. Form 18, dated August 31, 2001;
c. Form 60, dated October 6, 2000;
d. Form 28T, dated January 18, 2001;
e. Form 60, dated August 23, 2001;
f. Form 33, dated February 6, 2002;
g. Form 33R, dated March 8, 2002; and,
h. Form 33, dated June 7, 2002.
7. Plaintiff maintains that the following issues shall be determined following the hearing of this matter:
a. Whether plaintiff's psychological condition is causally related to the compensable accidental injury or occupational disease that occurred on or about May 16, 2000;
b. If plaintiff's psychological condition is causally related to the compensable accidental injury or occupational disease that occurred on or about May 16, 2000, what compensable consequences flow therefrom;
c. To what, if any, additional temporary total and/or temporary partial disability benefits is Plaintiff entitled;
d. To what, if any, permanent partial disability benefits is Plaintiff entitled; and,
e. To what, if any, additional medical compensation is Plaintiff entitled.
8. Plaintiff's medical records are received into evidence as Stipulated Exhibit No. 1.
 *********** EVIDENTIARY RULINGS
All objections raised in the depositions in this matter are ruled upon in accordance with the law and this Opinion and Award.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 38 years old. Plaintiff completed the 9th grade and later obtained a GED.
2. Defendants admitted that plaintiff had experienced a compensable injury involving his right hand on May 16, 2000, through the filing of an Industrial Commission Form 60 dated October 6, 2000. Plaintiff worked as a machinist for defendant for approximately 13 years prior to the date of injury. As a machinist, plaintiff would set up and run machines. Because plaintiff is right-hand dominant, he primarily used his right hand in his work.
3. In March 2000, plaintiff presented to his family physician, Dr. Gary Curran, with complaints of right-hand and finger extensor weakness, which included an inability to extend his first, second, and third fingers, as well as marked impaired lateral movement against resistance.
4. As a result of the problems presented, Dr. Curran referred plaintiff to a neurosurgeon, Dr. Seyed Emadian, in Asheville, North Carolina. On May 5, 2001, Dr. Emadian recommended that plaintiff undergo testing and physical therapy.
5. Dr. Emadian recommended that plaintiff undergo nerve conduction velocity studies. As a result of Dr. Emadian's recommendation, plaintiff underwent testing on May 16, 2000, with Dr. Daniel Garber, a neurologist practicing at Mountain Neurological Center. Dr. Garber noted that plaintiff's findings were fairly complicated, but were suggestive of posterior interosseous syndrome, which he stated was "definitely work-related."
6. Plaintiff next came under the care of Dr. Christopher Lechner, a board-certified orthopaedic surgeon with an added qualification in hand surgery, seeing Dr. Lechner first on July 7, 2000. Dr. Lechner formed a diagnosis of posterior interosseous nerve palsy. After trying non-surgical intervention, which included a splint, Dr. Lechner recommended that plaintiff undergo surgery.
7. On November 6, 2000, plaintiff underwent a neurolysis of the posterior interosseous nerve in the forearm. During the surgery, Dr. Lechner determined that plaintiff was suffering from a compression of posterior interosseous nerve where the vascular leash goes around a nerve, as well as a second point of compression of the nerve under the supinator. Dr. Lechner released the pressure off of the nerve and released the fascia. Unfortunately, there was no improvement after surgery, which was frustrating to both plaintiff and Dr. Lechner. On February 28, 2001, Dr. Lechner noted that plaintiff could not extend his fingers or thumb. Dr. Lechner continued to allow plaintiff to work with a one-pound weight restriction.
8. Dr. Lechner recommended that plaintiff return to Mountain Neurological for additional testing. At that point, plaintiff was also seen by Dr. Margaret Burke, who stated on February 20, 2001, that plaintiff had sustained a 75 percent permanent partial disability rating of the hand.
9. When plaintiff returned to Dr. Lechner on April 11, 2001, Dr. Lechner noted that plaintiff could not extend his fingers or his thumb. At this point, Dr. Lechner also diagnosed plaintiff with overuse syndrome of the left upper extremity with mild tendonitis, and increased plaintiff's weight restriction to ten pounds.
10. On May 16, 2001, plaintiff presented with complaints, which included high anxiety, to a doctor practicing with his family doctor, Dr. Allen Baumgarten. Dr. Baumgarten diagnosed probable general anxiety disorder and prescribed Paxil. Plaintiff returned to see another doctor in his family practice on May 21, 2001, at which time he complained of the side effects from the Paxil. Dr. Minick prescribed Buspar for plaintiff's anxiety problems. Plaintiff also complained to Dr. Minick of problems with depression. Although plaintiff had treated with Dr. Curran and the physicians at Hominy Valley Family Health Center since October 24, 1997, he had not undergone treatment for anxiety or depression, nor had he received prescriptions to treat these problems prior to the hand problem of May 16, 2000.
11. On May 23, 2001, plaintiff was admitted to Copestone, which is a psychiatric unit of Mission-St. Joseph's Health System. Plaintiff came under the care and treatment of Dr. Stewart Hudson, a psychiatrist practicing at The Pisgah Institute in Asheville, North Carolina.
12. Dr. Hudson testified that when he first met plaintiff at the hospital in May 2001, plaintiff had many concerns about his wrist drop. Dr. Hudson noted that plaintiff could not use his hand, and could not shake hands. Dr. Hudson testified, and the undersigned so finds, that plaintiff's wrist drop led to diminished self-esteem and caused an increase in anxiety. Dr. Hudson testified that when plaintiff was admitted to the psychiatric unit at Mission-St. Joseph's Hospital, he was experiencing severe depression, insomnia, anxiety, and fear. Dr. Hudson testified, and the Full Commission so finds, that the wrist drop problems that plaintiff experienced precipitated and were a significant contributing factor in the development of plaintiff's depression. Dr. Hudson also testified that plaintiff was worried about his job, which was a significant contributing factor to both the anxiety and depression that plaintiff experienced in May 2001.
13. Plaintiff was released after spending twelve days in a psychiatric unit, after which he continued care with Dr. Hudson and received counseling with Sara Mimms, a therapist at the Pisgah Institute. On August 1, 2001, plaintiff returned to Dr. Lechner, and reported that he was very frustrated with the inability to use his right hand. Dr. Lechner noted that there had been no improvement and that plaintiff was anxious to "move on." Dr. Lechner recommended, and plaintiff underwent, a second surgery. That surgery involved tendon transfers, which involves taking the superficialis to the middle and ring fingers and rerouting them. Dr. Lechner had recommended that plaintiff undergo this surgery several months prior to August 2001, but noted on June 20, 2001, that the surgery was delayed due to the stress that plaintiff was under. On August 1, 2001, Dr. Lechner explained to plaintiff that he would not have a "normal hand," but that the tendon transfer should allow plaintiff to get his fingers and thumb out of his palm. Dr. Lechner further noted that the surgery would not result in normal strength of the hand.
14. Plaintiff underwent the recommended surgery on August 14, 2001, after which he needed and received pain medication. According to an Industrial Commission Form 60 dated August 23, 2001, plaintiff received a second period of temporary total disability, which began on August 20, 2001. Plaintiff received temporary total disability until he returned to his regular job on November 19, 2001.
15. Plaintiff returned to Dr. Lechner on December 19, 2001, at which point Dr. Lechner noted that plaintiff could grasp, but that it was weak, and that plaintiff still had an extensor lag, which he corrects with a tenodesis effect of his wrist. On this date, Dr. Lechner released plaintiff from his care, and assigned a 40 percent permanent partial disability rating of the right arm.
16. Dr. Lechner characterized the 40 percent rating as a significant rating, which he testified was appropriate in his opinion because plaintiff had experienced a significant palsy. Dr. Lechner testified that with the kind of weak arm that plaintiff had after he was released and rated, there would be certain things plaintiff could not do despite the release to return to work with no restrictions.
17. Plaintiff returned to work on or about November 19, 2001. He was placed back at his regular machinist job. Plaintiff worked at his regular position until February 9, 2002, at which time he was told by defendant-employer that he was going to be discharged. Stan Cannon, general manager for defendant-employer, testified that plaintiff's performance and productivity had decreased and was not up to what plaintiff had been doing prior to his injury and surgeries. Plaintiff was offered a choice between being fired and taking a "layoff." Plaintiff chose the "layoff."
18. After plaintiff's admission to the Copestone Psychiatric Unit on May 23, 2001, he began to receive care with Sara Mimms, a therapist at the Pisgah Institute. Ms. Mimms testified that she first met plaintiff on June 7, 2001, at which point, she noted that plaintiff's hand was very withered. Plaintiff met with Ms. Mimms on March 4, 2002, after he lost his job with defendant. Plaintiff told Ms. Mimms that he was so depressed he could not get out of bed. Ms. Mimms testified that plaintiff was very tearful on this date, and expressed suicidal ideation. Plaintiff expressed hopelessness about getting a job to Ms. Mimms, who testified that plaintiff's confidence "was really blown when he lost his job."
19. Ms. Mimms testified, and the Full Commission so finds, that plaintiff's depression began with the injury to his hand and worsened after plaintiff lost his job in February 2002.
20. Dr. Hudson also testified that plaintiff experienced an increase in his depression, with insomnia, anxiety, anhedonia, and decreased motivation after he was discharged. Dr. Hudson testified that although plaintiff was not initially suicidal, he became suicidal. As a result of the upswing of depression and anxiety, plaintiff was readmitted to the Copestone Psychiatric Unit of Mission-St. Joseph's Hospital on March 4, 2002, at which time it was noted that plaintiff had recently lost his job of 15 years, after which he had experienced increased symptoms of depression with suicidal ideation.
21. After plaintiff's release from Copestone in March 2002, he secured a job with a different employer, Wright's Machine and Tool. Plaintiff testified that he worked at Wright's Machine and Tool from April 15, 2002, until May 27, 2002, making less money than he made with defendant. Plaintiff's work was similar to that which he did at Turnamics, which he testified required both hands. Plaintiff testified that he had to "manipulate" his right hand in order to perform the job, and had to use his left hand more.
22. Plaintiff was readmitted to the Copestone Psychiatric Unit of Mission-St. Joseph's Hospital on May 29, 2002, again as a result of the depression, which plaintiff first began experiencing in 2001. This resulted in plaintiff's losing his job with Wright's Machine and Tool.
23. After plaintiff was released from Copestone Psychiatric Unit in early June 2002, he continued to look for work on his own. Plaintiff secured employment with another employer, Day International, on August 5, 2002. Plaintiff testified that he was running a grinder at Day International making less money than he was making while in the employ of defendant-employer.
24. Plaintiff worked at Day International until November 8, 2002, at which time he was discharged. Plaintiff testified that he was told his work was not "up to par" and that he was having trouble keeping up.
25. Plaintiff continued to look for work after his discharge by Day International, securing employment with Black Mountain Machine November 18, 2002, the day before this matter was heard. Plaintiff testified that he was required to set up and run machines, which requires the use of both hands.
26. Dr. Hudson testified on January 31, 2003, that plaintiff had been readmitted to Copestone Psychiatric Unit in January 2003. Dr. Hudson testified that it was precipitated by the fact that plaintiff had been having difficulty in his employment and had not been able to hold down a job. Dr. Hudson testified that plaintiff had lost his latest job, which was with Black Mountain Machine, prior to this latest Copestone admission.
27. Dr. Hudson testified that as of the date of his deposition, January 31, 2003, plaintiff was unemployed and not capable of employment. Dr. Hudson and Ms. Mimms both testified that plaintiff needed additional counseling and psychiatric care.
28. Plaintiff testified that he had paid for the care that he received at Copestone Psychiatric Unit, and with Dr. Hudson and Ms. Mimms.
29. Plaintiff has received two periods of temporary total disability compensation, the first from September 26, 2000, to October 13, 2000, and the second from August 20, 2001, to November 19, 2001. However, plaintiff was unable to work from May 23, 2001, to August 20, 2001, both as a result of his hand injury and as a result of his psychiatric condition.
30. Plaintiff has worked for three different employers since leaving the employ of defendant-employer on or about February 9, 2002. Plaintiff testified that he has been unable to make as much money with these other employers as he was able to make while in the employ of defendant-employer.
31. Plaintiff has collected some unemployment benefits since his compulsory layoff of February 9, 2002. Plaintiff introduced into evidence at the hearing before the Deputy Commissioner the amount of unemployment that he collected.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On May 16, 2000, plaintiff experienced a compensable injury as a result of an occupational disease, involving his right hand, wrist, and arm. This injury occurred while plaintiff was in the course and scope of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's psychiatric problems, including depression and anxiety, for which he received care with Dr. Hudson and Sara Mimms, is causally related to the May 16, 2000, injury by accident and is a direct and natural result of this injury and ensuing physical disability. Hall v. Hanes Corporation,319 N.C. 167, 353 S.E.2d 392 (1987).
3. Plaintiff is entitled to temporary total disability compensation at a weekly rate of $360.00 from May 23, 2001, to August 20, 2001, and from February 9, 2002, until plaintiff began to work at Day International, during which time plaintiff was unable to earn wages as a result of his right hand injury and ensuing psychiatric problems. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to disability compensation for the difference between his average weekly wages before the injury and the average weekly wages that he was able to earn thereafter during his employment with Wright's Machine and Tool, Day International, and Black Mountain Machine. N.C. Gen. Stat. §97-30.
5. Plaintiff is entitled to full temporary total disability compensation for the period of unemployment since he was given an involuntary layoff on February 9, 2002, because he has been unable to work due to both his physical disability involving his right hand and arm, as well as his psychiatric disabilities, which developed as a direct and natural consequence of his physical injury and ensuing surgeries. N.C. Gen. Stat. § 97-29.
6. Defendants are entitled to a credit for all unemployment benefits paid to plaintiff since the involuntary layoff of February 9, 2002.
7. Plaintiff is entitled to ongoing temporary total disability compensation beginning on the date he last worked for Black Mountain Machine and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to reasonably necessary medical expenses including reasonably necessary psychiatric and counseling expenses, incurred or to be incurred for treatment related to the May 16, 2000, injury to plaintiff's right hand and arm, which tends to effect a cure, provide relief, or lessen the period of disability, including the Copestone Psychiatric Hospital admissions, as well as care provided by Dr. Hudson and Sara Mimms. Plaintiff is also entitled to reimbursement for travel to psychiatric and medical appointments and reimbursement for prescriptions. N.C. Gen. Stat. §§ 97-2(19); 97-25; and97-25.1.
9. Plaintiff has not yet reached maximum medical improvement with respect to his psychiatric problems, which are causally related to his compensable right hand injury.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at a weekly rate of $360.00 from May 23, 2001, through August 20, 2001. In addition, defendants shall pay plaintiff temporary total disability compensation from February 9, 2002, until April 15, 2002; from May 27, 2002, until August 5, 2002; and from the date plaintiff last worked for Black Mountain Machine continuing until further order of the Commission. Defendants are entitled to a credit for unemployment benefits received by plaintiff during such times.
2. Defendants shall pay plaintiff temporary partial disability compensation for the periods during which plaintiff worked for employers other than defendant in the amount of two-thirds of the difference between plaintiff's agreed-upon average weekly wages of $540.00 before the injury and the average weekly wages that he was able to earn thereafter with subsequent employers.
3. Defendants shall pay all reasonable medical expenses incurred or to be incurred for treatment related to plaintiff's May 16, 2000, right hand and arm injury, including psychiatric care and counseling for the psychiatric problems, which developed after this injury, to the extent such care, including psychiatric care and counseling, tends to effect a cure, provide relief or lessen the period of disability. Defendants shall also reimburse plaintiff for mileage to medical appointments, and for prescriptions.
4. A reasonable attorney's fee of 25 percent of the compensation awarded to plaintiff in paragraphs 1 and 2 above is approved for plaintiff's counsel. Twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, plaintiff's counsel shall receive every fourth compensation check.
5. Defendants shall pay the costs.
This 15th day of March 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER